UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JULIE A. SHEARMIRE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 07-CV-575-SAJ |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of the Social Security | ) |
| Administration, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**[1]

Pursuant to 42 U.S.C. § 405(g), Plaintiff appeals the decision of the Commissioner denying Disability Insurance benefits under Title II of the Social Security Act. Plaintiff asserts that (1) the ALJ failed to fully develop the record as to Plaintiff's intellectual functioning; (2) the ALJ failed to properly consider the treating psychiatrist's and case manager's opinion; (3) the ALJ failed to properly consider Plaintiff's credibility; and (4) the ALJ's finding that Plaintiff could perform other jobs was not supported by substantial evidence. For the reasons set forth below, the Court reverses and remands the Commissioner's decision for further proceedings consistent with this opinion.

**1. FACTUAL AND PROCEDURAL HISTORY**

Plaintiff, Julie A. Shearmire, was born on May 22, 1958 and was 48 at the time of the hearing. [R. 260]. She completed the ninth grade, but was placed in special education classes for most of the time she attended school. [R. 78, 88, 250]. Her past relevant work

---

[1] This Order is entered in accordance with 28 U.S.C. § 636(c) and pursuant to the parties' Consent to Proceed Before United States Magistrate Judge.

includes that of a certified nurse aide and cook. [R. 64-71]. She alleges that she has been disabled since April 17, 2003, due to arthritis and tendinitis. In October 2004, physicians at the OSU Family Medicine clinic diagnosed Plaintiff with rheumatoid arthritis, after a rheumatoid factor test was reactive. [R. 150, 154]. Plaintiff complained of pain in all of her joints, neck, and back, and the physicians examining her noted crepitance in both knees and a slight ulnar deviation of her fingers. [R. 152]. X-rays of Plaintiff's spine were performed on May 22, 2005, and revealed mild degenerative changes in her cervical spine, mild spondylosis of her thoracic spine, and mild facet arthrosis and mild hypertrophic spurring in her lumbar spine. [R. 147-49].

Dr. Steven Y.M. Lee performed a physical consultative examination on March 23, 2005. His report reflected normal findings, except for diminished range of motion in both knees, and in flexion of both little fingers. [R. 136, 138]. In September 2006, Dr. L.J. Whitt at the OU Tulsa Bedlam Community Health clinic noted that Plaintiff's arthritis was "flaring in [her] neck [and] back" and her right arm was swollen. Dr. Whitt also noted paravertebral spasm radiating from Plaintiff's cervical to lumbar spine. [R. 210].

Plaintiff sought individual counseling at Family and Children's mental health clinic in June 2005, complaining of depression from inability to work for the past two years due to arthritis. Plaintiff did not attend her next scheduled appointment because of another doctor's appointment and she did not have money to pay the fee. [R. 201]. On August 11, 2005, Plaintiff and her case manager, Judy Kmita, drew up a "therapy agreement and treatment plan" in which Plaintiff identified "anxiety [and] stress" as her main areas of concern, and depression, irritability, mood swings and difficulty in coping as her reactions to that anxiety and stress. [R. 188]. Plaintiff returned to treatment in August 2006 at Family

and Children's clinic. She reported problems with her focus and concentration and inability to sustain attention to a task for a period of time. [R. 173]. A treatment plan, dated February 19, 2007, reflects Plaintiff's complaints of daily panic attacks and depression related to chronic arthritis pain. [R. 230].

Plaintiff protectively filed an application for Disability Insurance benefits on November 18, 2004. [R. 57-59]. The Commissioner initially denied her application on May 6, 2005, [R. 46-49] and, on reconsideration, denied it again on February 3, 2006. [R. 42-44]. She then filed a Request for Hearing Before an ALJ on June 2, 2006, [R. 41] and ALJ John Volz held a hearing on April 19, 2007. [*See* R. 254-311]. On May 8, 2007, ALJ Volz concluded that Plaintiff had not been under a disability, as defined by the Social Security Act, from April 18, 2003, through the date of his decision. [R. 20]. Plaintiff then filed a Request for Review of Hearing Decision on June 28, 2007, [R. 8] and the Appeals Council denied her request on August 13, 2007. [R. 4-7]. Plaintiff now seeks judicial review.

## 2. SOCIAL SECURITY LAW AND STANDARD OF REVIEW

The Commissioner has established a five-step process for the evaluation of social security claims. *See* 20 C.F.R. § 404.1520. Disability under the Social Security Act is defined as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . .

42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act only if his

> physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy. . . .

3

42 U.S.C. § 423(d)(2)(A).[2]

The Commissioner's disability determinations are reviewed to determine (1) if the correct legal principles have been followed, and (2) if the decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).

The Court, in determining whether the decision of the Commissioner is supported by substantial evidence, does not examine the issues *de novo. Sisco v. United States Dept. of Health and Human Services*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will "neither reweigh the evidence nor substitute its judgment for that of the Commissioner." *Qualls v. Apfel*, 206 F.3d 1368, 1371 (10th Cir. 2000); *see Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). The Court will, however, meticulously examine the entire record to determine if the Commissioner's determination is rational. *Williams*, 844 F.2d at 750; *Holloway v. Heckler*, 607 F. Supp. 71, 72 (D. Kan. 1985).

---

[2] Step One requires the claimant to establish that she is not engaged in substantial gainful activity (as defined at 20 C.F.R. §§ 404.1510 and 404.1572). Step Two requires that the claimant demonstrate that she has a medically severe impairment or combination of impairments that significantly limit her ability to do basic work activities. *See* 20 C.F.R. § 404.1521. If claimant is engaged in substantial gainful activity (Step One) or if claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with those impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"). If a claimant's impairment is equal or medically equivalent to an impairment in the Listings, the claimant is presumed disabled. If a Listing is not met, the evaluation proceeds to Step Four, where the claimant must establish that her impairment or the combination of impairments prevents her from performing her past relevant work. A claimant is not disabled if the claimant can perform her past work. If the claimant is unable to perform her previous work, the Commissioner has the burden of proof (Step Five) to establish that the claimant, in light of her age, education, and work history, has the residual functional capacity ("RFC") to perform an alternative work activity in the national economy. If a claimant has the RFC to perform an alternate work activity, disability benefits are denied. *See Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

"The finding of the Secretary[3] as to any fact, if supported by substantial evidence, shall be conclusive, . . ." 42 U.S.C. § 405(g). Substantial evidence is that amount and type of evidence that a reasonable mind will accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Williams*, 844 F.2d at 750. In terms of traditional burdens of proof, substantial evidence is more than a scintilla, but less than a preponderance. *Perales*, 402 U.S. at 401. Evidence is not substantial if it is overwhelmed by other evidence in the record. *Williams*, 844 F.2d at 750.

This Court must also determine whether the Commissioner applied the correct legal standards. *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The Commissioner's decision will be reversed when he uses the wrong legal standard or fails to clearly demonstrate reliance on the correct legal standards. *Glass*, 43 F.3d at 1395.

### 3. ADMINISTRATIVE LAW JUDGE'S DECISION

In his decision, the ALJ determined that (1) Plaintiff had not engaged in substantial gainful activity at any time relevant to his decision; (2) Plaintiff's impairments, which consist of arthritis and obesity, are "severe"; (3) Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) Plaintiff has the residual functional capacity for sedentary work, with a sit/stand option and can perform uncomplicated, simple tasks with routine supervision; (5) Plaintiff is not capable of performing any of her past relevant work; and (5) Plaintiff can perform other work as a labeler, sorter and order clerk, as the

---

[3] Effective March 31, 1995, the functions of the Secretary of Health and Human Services ("Secretary") in social security cases were transferred to the Commissioner of Social Security. P.L No. 103-296. For the purposes of this Order, references in case law to "the Secretary" are interchangeable with "the Commissioner".

vocational expert identified those jobs as sedentary and not requiring the performance of work-related activities precluded by Plaintiff's residual functional capacity. [R. 19-21]. Accordingly, the ALJ concluded that Plaintiff had not been under a disability, as defined by the Social Security Act, at any time from April 17, 2003, through the date of his decision. *Id.*

## 4. REVIEW

### A.   The ALJ's Failure to Develop the Record

Plaintiff first asserts that the ALJ erred in failing to develop the record as to her limited intellectual functioning, when he refused to order a psychological consultative examination with IQ testing. Plaintiff contends there is evidence in the record to support her request for that consultative examination, based on Plaintiff's testimony that she was placed in special education classes from second through ninth grade. [R. 282]. She furnished documentation from her high school confirming her placement in special education classes there. [R. 250]. Plaintiff quit school in tenth grade. Although she began General Equivalency Diploma ("GED") classes, she quit those classes when she found she could not "understand the work" and she never acquired a GED. Plaintiff took the written portion of the driver's test three times because she did not understand the driver's education booklet. She was able to pass the written test only after her cousin repeatedly read the booklet to her. [R. 283-84]. Plaintiff barely passed her nurse aide certification test, despite help from her mother, aunts and cousins in studying for it. When the State required Plaintiff to take a nurse aide recertification test, she failed that test twice. Plaintiff testified that she was only able to gain recertification because her new employer at the rest

home allowed her to do a practical demonstration of the required tasks, such as taking blood pressure and bathing patients, in lieu of the written test for recertification. [R. 287, 289]. She testified that she could not read a newspaper article because of difficulty in understanding or comprehending what she read. [R. 290].

Prior to the hearing, Plaintiff apparently requested a consultative mental examination. The ALJ denied that request, stating that he "found no basis in the record for allowing [all of the requested tests] or for sending her out for a psych." He further stated that "[f]rankly, all the things that you point to about concentration and pace are statements that she has made" to Family and Children's mental health clinic. [R. 310]. However, the ALJ did not explain what he found in the record to prompt his denial of Plaintiff's request for a psychological consultative examination. The ALJ also failed to explain why he discounted the statements Plaintiff made to Family and Children's mental health clinic about her concentration and pace as not justifying a consultative examination. Further, the ALJ did not explain why Plaintiff's history of special education classes and difficulty in comprehending new or written material was not a separate reason for a consultative examination, in addition to her statements about concentration and pace.[4]

The Commissioner has "broad latitude in ordering consultative examinations." *Hawkins v. Chater*, 113 F.3d 1162, 1166 (10th Cir. 1997). In determining whether an ALJ has erred in failing to develop the record by ordering a consultative examination, "the

---

[4] "A consultative examination may be purchased when the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on your claim." A consultative examination may also be required if the "additional evidence needed is not contained in the records of your medical sources." 20 C.F.R. § 404.1519a(b)(1). No evidence of previous IQ testing appears in the record.

starting place must be the presence of some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation." *Id.* at 1167.  Plaintiff's placement in special education classes qualifies as such objective evidence. The ALJ "should order a consultative exam when evidence in the record establishes the reasonable possibility of the existence of a disability and the result of the consultative exam could reasonably be expected to be of material assistance in resolving the issue of disability." *Id.* at 1169.

Although Plaintiff has presented evidence suggesting the need for a psychological consultative examination, the ALJ's own RFC assessment indicates that such an examination should be performed.  Even though he found no "severe" mental impairments at Step Two, the ALJ included a restriction to "uncomplicated simple tasks with routine supervision" in his RFC assessment.  The ALJ failed to explain in his decision the basis for that mental restriction.  The Commissioner's regulations recognize that the ALJ may find an impairment non-severe at step two, but they require him to include any limitations from that impairment at step five, in combination with the impairments he finds "severe." *See*, 20 C.F.R. §§ 404.1523, 404.1545(a)(2).  The ALJ's decision does not indicate whether he provided that restriction in response to Plaintiff's depression and anxiety, or to her testimony of her limited intellectual functioning, since he failed to discuss any one of those impairments in connection with his RFC assessment.

The ALJ's "duty to develop the record is limited to 'fully and fairly develop[ing] the record as to material issues.'" *Baca v. Department of Health & Human Servs.*, 5 F.3d 476, 479-80 (10th Cir. 1993). The ALJ's restriction to "simple tasks" suggests that he recognized Plaintiff to have some limitation related to a mental impairment.  Whether that restriction

is due to Plaintiff's depression, anxiety, or a possible low level of intellectual functioning is more appropriate for medical professional to determine after examining Plaintiff. Therefore, on remand, the ALJ should obtain a mental consultative examination in order to fully develop the record, and then provide a supported rationale for his RFC assessment.

### B. The Treating Physician's and Case Manager's Opinion

Plaintiff contends that the ALJ erred because he failed to give weight to an assessment of Plaintiff's mental limitations that her treating physician, Dr. Ray Cordry and her case manager, Kristy Jones, completed on February 19, 2007. Dr. Cordry and Ms. Jones were among the physicians and staff at Family and Children's mental health clinic who treated Plaintiff for depression and anxiety since August 14, 2006. [R. 227]. Dr. Cordry and Ms. Jones assessed Plaintiff with several "extreme" limitations in her ability to perform detailed instructions, maintain attention and concentration for extended periods to perform detailed tasks, handle normal work stress, and accept instructions and criticism from supervisors; they indicated "extreme" limitations meant that, for 75 to 100 per cent of the work day, Plaintiff could not perform tasks requiring those abilities. They also found Plaintiff to have several "marked" limitations, indicating that for two-thirds or less of the work day she could not perform certain tasks, including remembering locations and work-like procedures, understanding and remembering simple instructions, and maintaining attention and concentration for extended periods in order to perform simple tasks. [R. 225-26].

The ALJ gave several reasons for rejecting this mental RFC opinion. The ALJ first stated that Dr. Cordry and Ms. Jones had not provided any "narrative or test results which support [their opinion]." [R. 19]. However, in *Robinson v. Barnhart*, 366 F.3d 1078 (10th

Cir. 2004), the Tenth Circuit clarified that a "psychological opinion may rest either on observed signs and symptoms or on psychological tests." *Id.* at 1083 (citing 20 C.F.R., Part 404, Subpart P, App. 1 § 12.00(B)). Thus, the lack of "test results" is not a valid reason to reject a treating physician's opinion, as Dr. Cordry's and Ms. Jones' observations of Plaintiff can also provide a basis for their opinion.

In *Watkins v. Barnhart,* 350 F.3d 1297 (10th Cir. 2003), the Tenth Circuit laid out the "sequential" framework for analysis the ALJ must follow in determining whether to rely on a treating medical source opinion. "[A]n ALJ must first determine whether the opinion qualifies for 'controlling weight.'" *Id.* at 1300. In determining whether to give controlling weight, the ALJ must consider whether the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and then whether the opinion is "consistent with other substantial evidence in the record." *Id.* SSR 96-2p[5] "contemplates that the ALJ will make a finding as to whether a treating source is entitled to controlling weight." *Id.* That finding "is necessary so that [the Court] can properly review the ALJ's determination on appeal." *Id.*

The ALJ did not make an explicit finding as to whether Dr. Cordry's and Ms. Jones' opinion was entitled to controlling weight, and the ALJ did not expressly state whether he found that opinion to be "well-supported" and/or "inconsistent with other substantial evidence" in the record. Instead, in stating that he "reject[ed] this medical source statement

---

[5] *See, Policy Interpretation Ruling Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions,* SSR 96-7p, 1996 WL 374186 at *5 (S.S.A, July 2, 1996)(ALJ's decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight.").

10

as there [is] no narrative . . . which support[s] it," [R. 19], the ALJ indicated that he did not give the opinion controlling weight because the lack of accompanying "narrative" made it not "well-supported."

At the second stage of the analytical framework, even if the ALJ determines that the treating source opinion is not entitled to "controlling weight," such opinions "are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §404.1527 and 416.927." After weighing the opinion under the regulatory factors, the ALJ must give "good reasons" in his decision "for the weight he ultimately assigns the opinion," and if he rejects it completely, he must then give "specific, legitimate reasons for doing so." *Watkins* 350 F.3d at 1300-01.

As reasons for rejecting that opinion, the ALJ noted that Plaintiff only saw Dr. Cordry "about once a month and that is only for medication," and Plaintiff's case worker wrote "most of the comments in their records." [R. 19]. From this, it appears the ALJ applied one of the regulatory factors relating to the nature and frequency of the treatment relationship between Dr. Cordry and Plaintiff. In assessing that factor, the ALJ must "look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered." 20 C.F.R. § 404.1527(d)(2)(ii). However, "[w]hen the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source." *Id.* If the ALJ relied on this factor, he failed to explain why he found Dr. Cordry's relationship merited rejection of his and Ms. Jones' opinion, rather than reduced weight. Since, as the ALJ acknowledged, Dr. Cordry saw Plaintiff at least once a month and prescribed her medications, Dr. Cordry must be presumed to have a "reasonable knowledge" of Plaintiff's

11

impairments which would entitle his opinion to "more weight" than would be given to a nontreating source.[6]  The ALJ's failure to explain why he completely rejected Dr. Cordry's opinion, rather than give it lesser weight, does not provide the "good reasons" the regulations require him to give in assigning no weight to that opinion.  *See*, 20 C.F.R. § 404.1527(d)("we will always give good reasons in our . . . decision for the weight we give your treating source's opinion.").

The ALJ also did not explain why he found Ms. Jones' and another case manager's authorship of "most of the comments" in Plaintiff's treatment records to be a reason to reject Dr. Cordry's and her opinion of Plaintiff's mental limitations.  If the ALJ rejected the opinion because Ms. Jones was the primary author, rather than Dr. Cordry, that rationale is contrary to the Commissioner's regulations and rulings.  As the Tenth Circuit has noted, the Commissioner's "regulations . . . also contemplate the use of information from 'other sources,' both medical and non-medical," to provide evidence to "show the severity of [a claimant's] impairment(s) and how it affects [a claimant's] ability to work."  *Frantz v. Astrue*, 509 F.3d 1299, 1301 (10th Cir. 2007)(citing 20 C.F.R. § 404. 1513(d)).  The Commissioner has recognized that, with the "growth of managed health care" and the "emphasis on containing medical costs," these "other" medical sources, such as licensed clinical social workers and therapists,  are "increasingly assum[ing] a greater percentage of the treatment

---

[6]The only other medical assessment of the severity of Plaintiff's mental impairments is a Psychiatric Review Technique Form, completed on December 15, 2005.  A nontreating medical consultant,  Sally Varghese, found Plaintiff's anxiety was not a "severe" impairment, and that she had only "mild" limitations in performing activities of daily living and in maintaining concentration, persistence and pace, with no limitations in social functioning. [R. 155-58].  Ms. Varghese did not assess the severity of Plaintiff's depression, and did not assess any limitations related to Plaintiff's anxiety or depression.  The ALJ did not mention Ms. Varghese's assessment in his decision.

and evaluation functions previously handled primarily by physicians and psychologists." The opinions of "other sources" thus may "be based on special knowledge of the individual" and "should be evaluated on key issues such as impairment severity and functional effects." *Titles II and XVI: Considering Opinion and Other Evidence from Sources Who are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies*, SSR 06-3p, 2006 WL 2329939 at *2, 3 (S.S.A. August 9, 2006). In SSR 06-3p, the Commissioner instructed his adjudicators to "explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the . . . decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at *6. Thus, even if there were support in the record for the ALJ's inference that only Ms. Jones authored the opinion, the ALJ still erred in failing to explain why her authorship of either the treatment records and/or the opinion merited complete rejection instead of some degree of lesser weight.

The ALJ did not "articulate . . . legitimate reasons" for his rejection of Dr. Cordry's and Ms. Jones' opinion.[7] On remand, the ALJ should follow the sequential analysis framework required by *Watkins* and SSR 96-2p, and explain the reasons for the weight he gives Dr. Cordry's and Ms. Jones' opinion of Plaintiff's mental capabilities.

### C. The ALJ's Credibility Determination

Ordinarily, "[c]redibility determinations are peculiarly the province of the finder of

---

[7] *See, Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004).

fact"[8] and the courts are reluctant to upset such determinations. However, some of the reasons the ALJ gave for finding Plaintiff not fully credible raise concerns of whether the ALJ provided Plaintiff with a full and fair hearing of her claim.

The ALJ found, among other reasons,[9] that Plaintiff was not credible because she "contradicted her responses a number of times during the hearing." [R. 18]. While an ALJ may consider inconsistencies as reducing a claimant's credibility, *Musgrave v. Sullivan*, 966 F.2d 1371, 1376 (10th Cir. 1992), SSR 96-7p requires the ALJ to be "sufficiently specific" in detailing what inconsistencies led him to conclude the claimant was not credible, in order to provide the claimant and subsequent reviewers an understanding of the weight the ALJ gave the claimant's statements and the reasons for that weight. *See*, *Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, SSR 96-7p, 1996 WL 374186 at *2 (S.S.A. July 2, 1996). The ALJ did not identify what specific contradictions he perceived in Plaintiff's testimony that caused him to find her not credible.

During Plaintiff's testimony, the ALJ chastised her for trying to "second guess what I'm asking," "anticipating the purpose of my questions . . . and you're changing some of your answers." The ALJ instructed Plaintiff, "don't tailor your answers to fit my questions,

---

[8] *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995).

[9] As his first reason for finding Plaintiff "not entirely credible," the ALJ stated that Plaintiff "did not use her cane when she went to the consultative examination in March 2005." [R. 18]. The ALJ specifically questioned Plaintiff at the hearing regarding her use of a cane, and why she did not use it at the consultative examination Dr. Steven Y. M. Lee conducted on March 23, 2005. Plaintiff responded that she did not begin using the cane until 2006, several months after Dr. Lee's examination. [R. 261-62.] In his decision, the ALJ failed to explain why he did not believe that testimony, and why he continued to assert that as a reason to find Plaintiff not credible.

just tell the truth." When Plaintiff's attorney attempted to clarify the testimony to which the ALJ objected, the ALJ told the attorney to "move on" [R. 302-03], rather than obtain further explanation from Plaintiff.

The ALJ has a "basic duty of inquiry, 'to inform himself about facts relevant to his decision and to learn the claimant's own version of those facts.'" *Dixon v. Heckler*, 811 F.2d 506, 510 (10th Cir. 1987). The ALJ cut off some of the attorney's questions and Plaintiff's responsive testimony, stating that "you've gone through that . . . I'm losing my patience now, okay" and threatening to conclude the hearing. [R. 303-06]. The hearing lasted approximately one hour and ten minutes, but the ALJ gave no reasons, either at the hearing or in his decision, why he pressed the attorney to curtail her presentation of evidence. "Applicants for social security disability payments. . . are entitled to be treated with respect and dignity no matter what the merits of their respective claims . . . . [n]otwithstanding and recognizing the time pressures imposed upon those hearing the huge volume of such claims, rudeness [or] impatience cannot be tolerated." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995); *see also, Rosa v. Bowen*, 677 F.Supp. 782, 783 (D.N.J. 1988)(the ALJ did not provide a full and fair hearing of the claimant's case, where the "ALJ's most pressing concern at the hearing was expedience," and the ALJ ordered the claimant's representative "to accelerate his presentation of the case").

Additionally, the ALJ's comments at the hearing on whether he was going to believe Plaintiff's testimony raise concern. During her attorney's questioning about Plaintiff's use of her hands for kitchen chores, the ALJ interjected, "I don't need to hear that, she's already said she's got problems with her fingers and her hands, you don't need to go into (INAUDIBLE), I heard it."

15

> ATTY: Okay, I'm trying to get an –
>
> ALJ:  Now whether I believe it or not is another matter, but I heard it.

The ALJ then interrupted the attorney's questions about Plaintiff's performance of other chores:

> ALJ: . . . we've been through this with the hands and the folding, I get the picture, I get the picture.
>
> ATTY: Okay.
>
> ALJ: It's either credible or it's not credible so, you know, beating a dead horse is not going to make it more credible. I understand, the lady says she's got problems with her hands, you know, they get stiff, and they swell, I, I heard all of that a number of times.
>
> ATTY: Okay.
>
> ALJ: So either get on to something else or let's move on. [R. 297-98].

The ALJ identified "arthritis" as one of Plaintiff's "severe" impairments, but he failed to explain in his RFC assessment what limitations he considered from her arthritis that restricted Plaintiff to sedentary work. Plaintiff's allegations of disability include pain in using her hands. The ALJ did not assess any specific limitations related to Plaintiff's ability to use her hands on a sustained basis in his RFC assessment, and he did not explain that omission. In his credibility determination, the ALJ did not address how he viewed Plaintiff's credibility about her complaints in using her hands. Given the ALJ's comments at the hearing of whether or not he had decided to believe Plaintiff's testimony about her hands, the ALJ should have provided some discussion of that issue in his RFC assessment and his credibility determination.

The ALJ's reliance on unspecified contradictions in Plaintiff's testimony is not a valid reason to discount Plaintiff's credibility. However, when the ALJ not only did not further

16

question Plaintiff at the hearing to resolve those contradictions, but also hindered Plaintiff's counsel's attempts to present evidence which might enable the ALJ to do so, the Court believes the ALJ did not provide Plaintiff with a full and fair hearing.

Because the Court has determined that Plaintiff's case must be remanded for further administrative proceedings, the Court will not address Plaintiff's allegations of error on the jobs the vocational expert named at Step Five.

IT IS SO ORDERED this 16th day of October, 2008.

Sam A. Joyner
United States Magistrate Judge